## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BILLIE JO BOWERS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00041 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: PAMELA MEADE SARGENT |
| **Commissioner of Social Security,** | ) | UNITED STATES MAGISTRATE JUDGE |
| Defendant. | ) | |

*I. Background and Standard of Review*

The plaintiff, Billie Jo Bowers, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI") under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

Case 2:07-cv-00041-JPJ   Document 18   Filed 06/24/08   Page 1 of 33   Pageid#: 60

consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bowers filed her applications for SSI and DIB on or about March 1, 2005, alleging disability as of July 4, 2004, due to enlarged heart problems, seizures, anxiety disorders and gastroesophageal reflux disease, ("GERD").[1] (Record, ("R."), at 37-41, 64, 260-61.) The claims were denied initially and on reconsideration. (R. at 22-31, 262-63.) Bowers then requested a hearing before an administrative law judge, ("ALJ"). (R. at 32-33.) The ALJ held a hearing on September 28, 2006, at which Bowers was represented by counsel. (R. at 338-58.)

By decision dated November 8, 2006, the ALJ denied Bowers's claims. (R. at 13-19.) The ALJ found that Bowers met the nondisability requirements for DIB purposes through the date of the decision. (R. at 18.) The ALJ found that Bowers had not engaged in substantial activity since the alleged onset date of July 4, 2004. (R. at 18.) The ALJ also determined that the medical evidence established that Bowers suffered from severe impairments, namely a history of a possible seizure disorder and anxiety; however, he found that Bowers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) In addition, the ALJ found that Bowers's allegations

---

[1]Although Bowers does not list an anxiety disorder or GERD as one of her alleged disabling conditions on her Disability Report, she included them in the arguments contained in her brief on appeal.

Case 2:07-cv-00041-JPJ   Document 18   Filed 06/24/08   Page 2 of 33   Pageid#: 61

regarding her limitations were not totally credible. (R. at 18.) The ALJ found that Bowers had the residual functional capacity to perform simple, low-stress light[2] work that did not require working in an environment that would expose her to hazards. (R. at 18.) The ALJ determined that Bowers was capable of performing her past relevant work as a cleaning inspector because performance of this occupation was not precluded by her residual functional capacity. (R. at 19.) Thus, the ALJ concluded that Bowers was not under as disability as defined in the Act and that she was not entitled to benefits. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007).

After the ALJ issued his decision, Bowers pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 4-8.) Bowers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Bowers's motion for summary judgment, which was filed on February 19, 2008, and on the Commissioner's motion for summary judgment, which was filed on March 12, 2008.

## *II. Facts*

Bowers was born in 1966, (R. at 37, 42, 70), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). According to the record, Bowers has a high school education, (R. at 68, 342), and also has past relevant work experience as a restaurant worker, a production supervisor, a production worker, an

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

-3-

assembler, a material handler and a cleaning inspector.  (R. at 14, 44-57, 343-44.)

At the hearing before the ALJ on September 28, 2006, Bowers testified that she last worked at a diner and a truck stop, where she served as a cook, waitress, cashier and buffet worker. (R. at 342.) Bowers explained that the job required her to constantly be on her feet, deal with customers, lift items weighing less than 50 pounds and that it also required a good deal of bending, stooping, lifting and carrying. (R. at 343-44.)  Bowers testified that she was forced to stop working at the diner due to breathing problems associated cleaning materials she used at work, which she claimed "made [her] feel like [she] was having a heart attack." (R. at 344-45.)  She further testified that she previously worked in factories, where she assembled parts and acted as a "floor person." (R. at 343-44.)  Bowers indicated that the factory work required her to stand and to lift items weighing 50 pounds or more. (R. at 344, 352.)

Bowers acknowledged that, at the time of the hearing, she was being treated at the Highlands Mental Health Clinic. (R. at 345.)  She explained that she was being treated for anxiety, nervousness and panic attacks. (R. at 345.)  Bowers indicated that she experienced a panic attack approximately one time per week. (R. at 345.)  She testified that the panic attacks caused shortness of breath and numbness in her arms and legs. (R. at 346.)  Bowers further noted that the attacks generally forced her to lie down, stand up or sit down, depending on the situation, and that she had to take time out to concentrate and breathe. (R. at 346.)  She explained that it usually took approximately 30 minutes for her to feel normal again. (R. at 346.)  Bowers commented that the medication prescribed to treat her problems caused her to sleep a lot, but she noted that she took the medication only prior to going to bed. (R. at

-4-

346.)  She acknowledged that, previously, she had taken the medication three times per day, but it caused her to sleep throughout the day.  (R. at 346-47.)  Bowers indicated that she took Xanax from February 2005 until June 2006, and that, at the time of the hearing, she was taking Remeron.  (R. at 347.)  Bowers also stated that she was  supposed to take Vistaril as well, but testified that she could not afford to have the prescription filled.  (R. at 347.)

Bowers testified that she had a history of seizures since youth.  (R. at 347.)  She noted that she last experienced a seizure in February 2006.  (R. at 348.)  Bowers explained that she suffered from fairly serious seizures, which caused her to get hot and sweaty, black out and then collapse to the floor.  (R. at 348.)  At the time of the hearing, Bowers was not taking any medication to treat her seizure disorder.  (R. at 348-49.)  Bowers testified that she had an enlarged heart that caused her heart to beat very fast, resulting in shortness of breath.  (R. at 349.)  She stated that she was tired most of the time, without any energy.  (R. at 349.)

Bowers also testified that she constantly experienced crying spells, and explained that she "cr[ied] more than [she] laugh[ed]."  (R. at 349.)  She testified that she lived by herself, but that her sister helped her.  (R. at 349.)  Bowers explained that, during a typical day, she usually spent the majority of her time sleeping or lying around.  (R. at 350.)  She noted that she did not have a driver's license and that she was totally dependent on others to take her places.  (R. at 350.)

The ALJ questioned Bowers as to her treatment from Dr. David R. Delaplane, M.D.  (R. at 352.)  Bowers testified that Dr. Delaplane diagnosed her with heart

disease, and she indicated that she had received treatment from him subsequent to 2005. (R. at 352-53.) At the hearing, Bowers indicated that she had lost approximately nine pounds due to worry and sickness. (R. at 353.) When asked whether she could perform household chores, Bowers explained that she did not "do much of anything." (R. at 353.) Bowers stated that her sister helped her with household duties. (R. at 353.)

Cathy Sanders, a vocational expert, also was present and testified at Bowers's hearing. (R. at 354-56.) Sanders identified Bowers's past work as a restaurant worker, a cleaning inspector, a material handler and a production worker as light, unskilled work, and she identified Bowers's work as a production supervisor as light, skilled work. (R. at 354.) Furthermore, Sanders noted that Bowers's work as an assembler was unskilled, medium[3] work. (R. at 354.) The ALJ asked Sanders to consider a hypothetical individual of Bowers's age, education and work experience, who could perform light work, but who could perform only simple, low-stress jobs that would not require the individual to work around or operate dangerous equipment or machinery. (R. at 355.) Sanders testified that, based upon the restrictions noted, such an individual could perform jobs such as a cashier, a waiter, a nonconstruction laborer, a counter clerk, a general office assistant, a hand packager and part of the range of inspector and sorter jobs. (R. at 355.) The ALJ further asked Sanders to consider Exhibit 7F,[4] which noted severe problems with emotionality, irritability,

_____

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2007).

[4]Exhibit 7F contains medical records dated June 26, 2006, from Highlands Community Services, where an evaluation was conducted by Mark E. Morgan, M.A. (R. at 235-40.)

-6-

anxiety, panic attacks, obsessions and compulsions and loose associations. (R. at 355-56.) Specifically, the ALJ asked Sanders to consider that the problems noted in Exhibit 7F caused the individual to frequently be unable to concentrate and persist at work tasks. (R. at 356.) Sanders opined that such an individual would not be able to perform the previously mentioned jobs, considering the limitations as set forth in Exhibit 7F. (R. at 356.)

In rendering his decision, the ALJ reviewed medical records from Washington County Health Department - VDH Family Planning; Johnston Memorial Hospital; Cancer Outreach Associates; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Howard Leizer, Ph.D, a state agency psychologist; Louis A. Perrott, Ph.D., a state agency psychologist; Mark E. Morgan, M.A.; and Stone Mountain Health Services. Subsequent to the hearing, Bowers's counsel submitted additional medical records to the Appeals Council from Highlands Community Services; Washington County Health Department - VDH Family Planning; and the University of Virginia, Department of Neurology.[5]

Bowers has not challenged any of the ALJ's findings with respect to her alleged physical impairments. Thus, the facts summarized will focus on only the medical records relevant to her alleged mental impairments. Bowers was treated at Washington County Health Department - VDH Family Planning from August 1997,

_____

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

to November 2004, regarding reproductive health. (R. at 122-37.) These medical records contain minimal treatment of, or reference to, significant mental health issues. (R. at 122-37.) On August 21, 2000, Bowers was diagnosed with questionable depression and panic attacks. (R. at 125.) The next reference to Bowers's mental health was on November 13, 2004, when Bowers complained of mental stress. (R. at 129.) The medical records indicate that Bowers suffered from "a lot of mental stress" and that she was "in need of counseling." (R. at 129.) In addition, it was reported that Bowers was living in an abusive situation. (R. at 129.) As a result, an appointment was scheduled at Highlands Counseling Center, and Bowers was given contact information to local abuse and crisis centers. (R. at 129.)

Bowers sought treatment at Johnston Memorial Hospital emergency room periodically from December 14, 2004, to January 18, 2006. (R. at 138-71, 195-234.) Bowers presented on December 14, 2004, and complained of injuries that allegedly resulted from domestic abuse. (R. at 221.) Upon examination, Bowers was oriented to person, place and time, and she demonstrated a normal mood and affect, but appeared to be anxious. (R. at 219.) Bowers was diagnosed with a contusion to the face and leg and was informed that a traumatic event, such as domestic abuse, could cause both physical and emotional injuries. (R. at 218, 220.) Bowers was advised to stay at a shelter and to schedule an appointment with a mental health professional. (R. at 218.)

Bowers was admitted to Johnston Memorial Hospital on February 9, 2005, after a series of episodes that resulted in loss of consciousness. (R. at 138-71.) Due to Bowers's medical history of seizures, she was admitted for further testing and

-8-

observation. (R. at 138-71.) In particular, Bowers was evaluated to determine if her episodes were the result of syncope[6] or panic. (R. at 148, 161.) In a review of systems, Dr. David R. Delaplane, M.D., reported that Bowers was positive for recent fevers, chills and night sweats, and also noted that her sleep was very poor. (R. at 141.) Dr. Delaplane also referenced a history of tingling and numbness in the upper extremities as a result of chest pain, which he said was previously thought to be related to a panic disorder. (R. at 141.) Upon examination, Dr. Delaplane noted that Bowers was slightly anxious and afebrile. (R. at 142.) Bowers tested positive for benzodiazepines and marijuana, but her remaining examination was unremarkable. (R. at 142.) Dr. Delaplane determined that Bowers's syncopal episodes were likely a primary cardiac episode. (R. at 142.) Furthermore, he opined that Bowers may suffer from "short runs of paroxysmal supraventricular tachycardia and/or V-tach or more morbid cardiac arrhythmias." (R. at 142.) Bowers also was diagnosed with depression, general anxiety disorder, a history of GERD, a remote history of seizure disorder and a history of migraine headaches. (R. at 142.) As a result, Bowers was placed on observational status and further testing was ordered. (R. at 143.)

On February 10, 2005, Dr. Steven W. Morgan, M.D., performed a neurology consultation. (R. at 151-53.) Dr. Morgan referenced Bowers's history of seizures and also noted a history of panic attacks. (R. at 151.) Bowers reported that she had been sleeping well, but noted a problem with anxiety. (R. at 152.) Upon examination, Bowers was alert and fully oriented, with an intact memory and high cortical functions. (R. at 152.) Dr. Morgan suspected that Bowers suffered from epilepsy.

---

[6]Syncope is "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1629 (27th ed. 1988).

(R. at 152.) Dr. Delaplane ordered an electroencelphalogram, ("EEG"), in which beta activity suggested the possibility of a heightened anxiety state or medication effect such as benzodiazepine or barbiturate. (R. at 154.)

Dr. Michael Klingerman, M.D., noted that, after admission, Bowers experienced no further syncopal episodes. (R. at 138.) Dr. Klingerman also reported that Bowers's electrocardiogram, ("EKG"), was normal, and no cardiac abnormalities were detected. (R. at 138.) He determined that the loss of consciousness was likely not a seizure episode. (R. at 138.) Dr. Klingerman also explained that, due to Bowers's anxiety and depression, she probably needed to be treated with selective serotonin uptake inhibitors, (SSRIs), but because of the uncertainty as to a possible seizure disorder, this treatment was not recommended, as it could lower Bowers's seizure threshold. (R. at 139.) Dr. Klingerman reported a primary diagnosis of neurogenic syncope and a secondary diagnosis of possible seizure disorder, anxiety disorder, depression and GERD. (R. at 138.) Bowers was discharged on February 10, 2005, in stable condition and was prescribed Xanax and Protonix. (R. at 138-39.) Dr. Klingerman advised Bowers that he would contact a neurologist regarding her possible epilepsy, and he also recommended that Bowers undergo a psychiatric evaluation due to her stress and depression. (R. at 139.)

On January 18, 2006, Bowers again presented to the emergency department at Johnston Memorial Hospital with a chief complaint of an anxiety attack. (R. at 196-98.) Bowers complained of anxiety and chest pain, which she said had worsened over the previous weeks. (R. at 196.) She appeared to be very anxious and was unable to directly answer questions unless asked multiple times, which was attributed to the fact

-10-

she was required to appear in court the previous day regarding a domestic violence issue. (R. at 196.) An examination revealed normal findings; however, the clinical impression noted anxiety. (R. at 197.) Bowers indicated that she needed a refill of her Xanax because her medication had been stolen. (R. at 197-98.) Bowers appeared to be agitated, and the examining physician noted a past history of psychiatric problems, namely anxiety. (R. at 198.) Bowers was diagnosed with an anxiety/panic attack. (R. at 195.) She was advised that anxiety can cause intense feelings of worry and fear and that it also can cause physical symptoms such as chest pain, shortness of breath, palpitations and numbness. (R. at 195.) Bowers was prescribed Phenergan for nausea and anxiety. (R. at 195.) She also was advised to follow up with her counselor and her family doctor. (R. at 195.)

On April 26, 2005, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 181-94.) Leizer found that, although Bowers suffered from an anxiety-related disorder, it was not severe. (R. at 181.) Leizer noted no episodes of decompensation, and he also determined that Bowers was only mildly limited in her activities of daily living, in her ability to maintain social functioning and in her ability to maintain concentration, persistence or pace. (R. at 191.) Leizer pointed out that the medical records did not include psychiatric treatment, other than Bowers's prescription for Xanax. (R. at 193.) He also stressed that the psychiatric-related diagnoses were provided by a medical doctor, not a mental health professional. (R. at 193.) Leizer reported that the only other indication of the existence of a psychiatric issue was included in Bowers's self-reported activities of daily living. (R. at 193.) He determined that Bowers's allegations were only partially credible. (R. at 194.) Lastly, it was noted, that

although Bowers alleged worsening emotional symptoms and/or conditions, she was being treated with only psychotropic medications, which were prescribed by a nonpsychiatric physician, with no evidence of a referral to a mental health professional.  (R. at 194.)  On July 8, 2005, Leizer's findings were reviewed and affirmed by Louis A. Perrott, Ph.D., another state agency psychologist.  (R. at 181.)

Bowers sought treatment from Mark E. Morgan, M.A., at Highlands Community Services on June 26, 2006, due to emotional and psychiatric problems.  (R. at 235-40.)  Bowers presented with complaints of anxiety, numbness and pain in the extremities, crying spells and fearful feelings.  (R. at 235.)  Bowers's symptoms were reported as severe in the areas of emotionality, irritability, anxiety, panic attacks, obsessions/compulsions and loose associations.  (R. at 235.)  Furthermore, moderate symptoms were reported in the areas of social isolation, worthlessness, depressed mood, appetite, elimination and sleep disturbance, fatigue or low energy, poor concentration, mood swings, agitation and phobias.  (R. at 235.)  Mild symptoms included: poor grooming, limited social skills, delusions, hopelessness, guilt, elevated mood, hyperactivity and significant weight gain/loss.  (R. at 235.)  It is not clear whether these notations were objective findings by Morgan, or whether they were simply subjective complaints reported by Bowers.  (R. at 235.)  Bowers reported past abuse, including being abused by her former boyfriend and being raped as a child.  (R. at 236.)  During the evaluation, Bowers indicated that she did not currently drink alcohol, but she admitted that she smoked marijuana.  (R. at 237.)  Bowers noted that she had previously participated in mental health services in September 2005, and she indicated that she had been displaced from her home due to an abusive relationship on more than one occasion.  (R. at 239.)  Bowers also reported that she had been

-12-

prescribed Xanax to treat her emotional/psychiatric problems. (R. at 240.)

Bowers received treatment from Stone Mountain Health Services from September 12, 2005, to June 28, 2006. (R. at 241-59.) Medical records during this time period indicate that Bowers suffered from, among other things, anxiety and substance abuse problems. (R. at 250.) A personal history form indicated relevant symptoms such as depression, excessive moodiness, mental illness, difficulty sleeping, nervousness, depression and memory loss. (R. at 248-49.) On September 12, 2005, Bowers was diagnosed with anxiety and alcohol/substance abuse. (R. at 246.) On June 9, 2006, Bowers reported that she worried constantly. (R. at 245.) A physical examination indicated that Bowers's memory, mood, affect, judgment and insight were normal, and she was oriented to person, place and time. (R. at 244.) Bowers was referred to Highlands Community Services for mental health care. (R. at 243.) However, the treating physician refused to prescribe Xanax and noted that the medication needed to be prescribed by a mental health professional. (R. at 243.) On June 15, 2006, Stone Mountain Health Services contacted Highlands Community Services to refer Bowers; however, they were informed that Bowers was required to personally call. (R. at 242.) Medical notes dated June 28, 2006, indicated that Bowers sought treatment at Highlands Community Services. (R. at 241.) In addition, it was noted that the personnel at Stone Mountain Health Services saw no reason for Bowers to be prescribed Xanax. (R. at 241.)

The following medical records were submitted to the Appeals Council, subsequent to the hearing before the ALJ. Bowers was treated at Highlands

Community Services from August 2, 2006, to November 6, 2006, by Morgan.[7] (R. at 264-79.) On September 6, 2006, Morgan noted that Bowers appeared to be anxious and depressed; however, he also noted that her attention, abstraction, concentration, memory and insight were intact. (R. at 267-68.) In addition, Bowers was cooperative, alert and oriented, with an appropriate affect and normal thought production. (R. at 267-68.) Morgan noted no delusions or suicidal/homicidal ideations, and he also estimated that Bowers was of average intelligence. (R. at 267-68.) According to Morgan, Bowers was tearful at times during the interview, with her predominant mood being depressed and frustrated. (R. at 267-68.) Morgan reiterated that Bowers appeared to be somewhat depressed and anxious, and that she obsessed about the stresses regarding her medical and emotional situation. (R. at 268.) Bowers reported sleep and appetite problems, which she attributed to "racing thoughts" about her current situation. (R. at 268.) Morgan noted panic attacks, moderate depression, moderate anxiety and decreased energy, but noted no irritability or risk of harm to others. (R. at 275.) Bowers was diagnosed with marijuana dependence, anxiety disorder, which was attributed to a medical condition, an enlarged heart and occupational, housing and economic problems. (R. at 265.) In addition, Morgan assessed Bowers's Global Assessment of Functioning, ("GAF"), score at 51.[8] (R. at 265, 269.) Treatment goals and plans were established in an effort to stabilize

---

[7]Bowers failed to present for her scheduled appointments on August 2, 2006, and October 13, 2006. (R. at 264, 278.)

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51-60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32.

Bowers's anxiety level, increase her ability to function on a daily basis and to develop coping skills to deal with anxiety and depression. (R. at 265, 272, 274.) In addition, another treatment goal was to achieve total abstinence from all mood-altering substances.[9] (R. at 265.)

On September 14, 2006, Bowers presented to Highlands Community Services and complained that her medications had been discontinued.[10] (R. at 276.) The psychiatric assessment form noted that Bowers complained of nausea, worry, shortness of breach, sweating, trembling, crying spells, sleep difficulties and appetite problems. (R. at 276.) Bowers also admitted to smoking marijuana on "most days." (R. at 276.) Bowers was alert and oriented to person, place and time, but she displayed a less than average intelligence. (R. at 276.) Bowers was diagnosed with anxiety, not otherwise specified, and her GAF score was assessed at 55. (R. at 276.) Bowers was prescribed Remeron and Vistaril. (R. at 276.)

Bowers returned to Highlands Community Services on September 25, 2006. (R. at 277.) Morgan noted symptoms of hypersomnia, increased appetite, decreased

---

[9]The court notes that portions of the medical records dated September 6, 2006, are inconsistent. For instance, some of the treatment notes dated September 6, 2006, indicated a GAF score of 48, as well as decreased concentration. (R. at 275.) Conversely, additional notes dated September 6, 2006, revealed a GAF score of 51 and showed findings that Bowers's concentration was intact. (R. at 265, 267.) As to the concentration discrepancy, it is impossible to determine whether the notes were subjective complaints made by Bowers, or if they were objective findings made by the medical professional.

A GAF score of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32.

[10]The treatment notes from this particular visit are partially illegible. (R. at 276.)

-15-

energy and concentration, crying spells, moderate depression and mild anxiety. (R. at 277.) However, there were no reports of irritability, risk of harm to others, panic attacks or suicidal/homicidal ideations. (R. at 277.) Bowers complained of depression caused by her life situation. (R. at 277.) Bowers explained that she was unable to work due to pain, and she acknowledged a DUI conviction that resulted in the loss of her driver's license. (R. at 277.) She also reported a medical history of seizures and noted that she had been prescribed a medication that caused her to sleep too much and gain weight. (R. at 277.) Bowers expressed concern regarding the medication, as she stated that she did not want to become a "zombie." (R. at 277.) Morgan reported that Bowers had a very good attitude as to her future life goals. (R. at 277.) Morgan assessed Bowers's GAF score at 54. (R. at 277.)

Bowers again presented to Highlands Community Services for treatment on November 6, 2006. (R. at 279.) Morgan noted symptoms of insomnia, decreased appetite, energy and concentration, crying spellings, irritability, mild depression and moderate anxiety. (R. at 279.) Bowers reported no panic attacks or suicidal/homicidal ideations, and she presented no risk of harm to others. (R. at 279.) Bowers stated that she was losing her positive outlook on life and was negative about her current life situation. (R. at 279.) She also explained that her disability claim was taking too long, which forced her to depend on others for assistance. (R. at 279.) However, she noted that she could not rely on anyone. (R. at 279.) Bowers acknowledged that she drank alcohol and smoked marijuana. (R. at 279.) Morgan noted that Bowers was "very distressed" and "tearful." (R. at 279.) Morgan assessed Bowers's GAF score at 50. (R. at 279.)

-16-

The administrative file also contains additional medical records dated October 12, 1987, to October 31, 2005, from Washington County Health Department - VDH Family Planning. (R. at 280-325.) The records from that time period are not relevant, as they almost exclusively pertain to reproductive health. (R. at 280-325.) However, the court notes that, during these visits, Bowers reported symptoms of anxiety on August 25, 1997, and October 26, 2005. (R. at 280-82.)

Bowers was treated from May 5, 2005, to February 9, 2006, by the University of Virginia, ("UVA"), Department of Neurology. (R. at 326-37.) In a letter dated May 5, 2005, Dr. William C. Taft, M.D., of the University of Virginia, revealed his findings to Dr. Delaplane. (R. at 334-37.) Dr. Taft noted that Bowers had been referred to him for further evaluation regarding episodes of seizures. (R. at 334.) Dr. Taft observed that Bowers was an "extremely anxious woman [who shook and had a] tremor in her voice." (R. at 334.) He opined that her spells were triggered by increased stress, notably an emotionally and physically abusive relationship. (R. at 334.) Dr. Taft reported that the abusive relationship had previously caused Bowers to seek shelter in a woman's facility on several occasions. (R. at 334.) Dr. Taft also reported that Bowers's medical history was largely centered around issues of anxiety and subsequent medical evaluations. (R. at 335.) However, he explained that no firm diagnoses had been ascertained, and that although her prescription of Xanax helped, it had not solved her problems. (R. at 335.)

Upon examination, Dr. Taft reiterated that Bowers was an extremely anxious person. (R. at 335.) The remainder of the physical examination was fairly unremarkable. (R. at 335.) Dr. Taft stressed that the main concern was the issue of

-17-

safety in the home. (R. at 335.) He explained that he would pursue the possibility of arranging a safer living environment for Bowers, and he recommended that Bowers see a psychiatrist for therapy and pharmacologic management. (R. at 335-36.) Dr. Taft opined that Bowers suffered from an anxiety disorder with superimposed panic attacks. (R. at 336.) Dr. Taft further opined that Bowers needed additional pharmacologic and therapeutic support. (R. at 336.) He increased Bowers's dosage of Xanax to address her anxiety and panic attacks, but declined to proceed with SSRIs, so as not to interfere with future care. (R. at 336.) Dr. Taft concluded that neurologic disease was doubtful, and emphasized the need to expedite a psychiatric evaluation. (R. at 336.)

Bowers sought treatment on July 14, 2005, at UVA's Southwest Virginia Clinic. (R. at 331-32.) During this visit, Bowers reported panic attacks. (R. at 331.) Bowers was once again observed to be anxious, but her remaining physical examination was otherwise normal. (R. at 331.) Bowers was diagnosed with generalized anxiety, and urgent psychiatric care was recommended. (R. at 331.) The report indicated that epilepsy was doubted, but her living situation created concern. (R. at 331.) It was recommended that Bowers see a local social worker in an attempt to improve her living situation and to obtain a psychiatric referral. (R. at 331.) Bowers returned for treatment on September 8, 2005, for a follow-up regarding panic attacks. (R. at 329.) Bowers reported symptoms of heart fluttering, generalized anxiety, shortness of breath and numbness in the extremities. (R. at 329.) Bowers was reportedly "doing much better[,]" and the frequency of her panic attacks had reduced. (R. at 329.) However, Bowers explained that she had not taken her Xanax for several weeks due to financial reasons. (R. at 329.) Upon examination, Bowers

-18-

appeared less anxious, was smiling and "doing well." (R. at 329.) Once again, Bowers's physical examination was unremarkable. (R. at 329.) The clinical impression noted generalized anxiety and panic attacks, which were reportedly under improved control. (R. at 329.) Bowers was prescribed Xanax and instructed to return in four months. (R. at 329.) In addition, Bowers noted that she thought she had improved, and she was observed to be "quite happy[.]" (R. at 329.)

On February 9, 2006, Bowers again presented to UVA's Southwest Virginia Clinic. (R. at 326.) The clinical notes indicated that Bowers's panic attacks and anxiety were exacerbated by her poor social situation, i.e. her abusive relationship. (R. at 326.) At this visit, Bowers appeared extremely anxious and complained that "she was going to die" and that her "heart rate was slow." (R. at 326.) While her remaining examination was otherwise unremarkable, Bowers was again diagnosed with generalized anxiety disorder and panic attacks. (R. at 326.) Dr. Alexander A. Grunsfeld, M.D., opined that Bowers would be best served by being treated for her anxiety and panic attacks solely by Dr. Semide, M.D., a psychiatrist. (R. at 326.) Dr. Grunsfeld also opined that Xanax was not the best medication for Bowers, as he indicated that she needed a longer-acting drug. (R. at 327.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is

-19-

working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 8, 2006, the ALJ denied Bowers's claims. (R. at 13-19.) The ALJ found that Bowers met the nondisability requirements for DIB purposes through the date of the decision. (R. at 18.) The ALJ found that Bowers had not engaged in substantial activity since the alleged onset date of July 4, 2004. (R. at 18.) The ALJ also determined that the medical evidence established that Bowers suffered from severe impairments, namely a history of a possible seizure disorder and anxiety; however, he found that Bowers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart

P, Appendix 1.  (R. at 18.)  In addition, the ALJ found that Bowers's allegations regarding her limitations were not totally credible.  (R. at 18.)  The ALJ found that Bowers had the residual functional capacity to perform simple, low-stress light work that did not require working in an environment that would expose her to hazards.  (R. at 18.)  The ALJ determined that Bowers was capable of performing her past relevant work as a cleaning inspector because performance of this occupation was not precluded by her residual functional capacity.  (R. at 19.)  Thus, the ALJ concluded that Bowers was not under a disability as defined in the Act and that she was not entitled to benefits.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007).

Bowers argues that the ALJ's decision was not supported by substantial evidence.  (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.)  Bowers contends that the ALJ failed to properly consider evidence that was submitted to the Appeals Council subsequent to the hearing, which, if properly considered, may have led the ALJ to a different conclusion regarding her mental limitations.  (Plaintiff's Brief at 9–12.)  Thus, Bowers argues that, pursuant to 42 U.S.C. § 405(g), the court should remand the case.  (Plaintiff's Brief at 9-12.)  Bowers also argues that the ALJ's finding as to her mental limitations was not supported by substantial evidence within the record, as the medical records show that her mental impairments are more severe and limiting than found by the ALJ.  (Plaintiff's Brief at 6-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Bowers's argument that, according to sentence six of 42 U.S.C. § 405(g), a remand is warranted in this case because new evidence was presented to the Appeals Council that was material to the determination of disability. (Plaintiff's Brief at 9-11.) Bowers contends that the additional evidence submitted to the Appeals Council subsequent to the hearing shows that her mental impairments are more severe and limiting than found by the ALJ. (Plaintiff's Brief at 9.)

In this case, after the ALJ's hearing, Bowers's counsel submitted additional

records to the Appeals Council. The Appeals Council found no reason under the rules to review the ALJ's decision; thus, the ALJ's decision was affirmed, and Bowers's request for review was denied. (R. at 4-8.) The Appeals Council specifically explained that it considered the records dated August 2, 2006, to November 6, 2006, from Highlands Community Services; the records dated October 12, 1987, to October 26, 2005, from Washington County Health Department - VDH Family Planning; and the records dated May 5, 2005, to February 9, 2006, from the University of Virginia, Department of Neurology. (R. at 4-5, 8.) However, the Appeals Council determined that the information did "not provide a basis for changing the [ALJ's] decision." (R. at 5.)

Pursuant to 42 U.S.C. § 405(g) sentence six,

> [this] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

According to the Supreme Court, "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand [than the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). Thus, in order for the court to properly grant a remand under sentence six of § 405(g), the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins*, 953

-23-

F.2d at 95-96. For the purposes of the this analysis, evidence is considered new "if it is not duplicative or cumulative." *Wilkins*, 953 F.2d at 96. Furthermore, as stated in *Wilkins*, "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." 953 F.2d at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)).

It also is imperative that good cause be shown for the failure to incorporate the new evidence into the record in a prior proceeding. Various courts have interpreted the "prior proceeding" language to include the ALJ stage of review, as well as the Appeals Council stage of review. *See Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. Feb. 20, 2008) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council."); *see also Ingram v. Astrue*, 496 F.3d 1253, 1269 (11th Cir. 2007) ("'[T]he question [under the sixth sentence] is not whether there is good cause for failure to present the evidence at the ALJ level, but rather for failure to present it at the administrative level, which includes the Appeals Council stage.'") (quoting *White v. Barnhart*, 373 F. Supp. 2d 1258, 1265 (N.D. Ala. 2005)).

Here, without addressing whether the additional evidence was new, material and related to the relevant time period, it is clear that the vast majority of the additional evidence presented to the Appeals Council was incorporated into the record. As such, this court is not permitted to remand pursuant to sentence six of 42 U.S.C. § 405(g) because the evidence was properly made a part of the record by the Appeals Council. *See Edwards*, 2008 U.S. Dist. LEXIS at *23; *Ingram*, 496 F.3d at 1269; *see also Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th Cir. 1992) ("[O]nce the evidence is

-24-

submitted to the Appeals Council it becomes part of the record, thus it would not make sense to require [the claimant] to present good cause for failing to make it part of a prior proceeding's record.")

Also, the court recognizes that the Appeals Council refused to incorporate certain evidence into the record that was presented by Bowers's counsel. (R. at 5.) The Appeals Council explained that it received medical records dated December 20, 2006, from the Washington County Health Department - VDH Family Planning, as well as records dated November 27, 2006, to January 2, 2007, from Highlands Community Services. (R. at 5.) The Appeals Council found that these records were not material to the issue of whether Bowers was disabled on or before November 8, 2006, the date of the ALJ's decision, because the records were dated subsequent to the ALJ's decision. (R. at 5.) After reviewing the Appeals Council's explanation, I agree that the records were not material in determining whether Bowers's was disabled on or before November 8, 2006. According to the regulations,

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision.

20 C.F.R. §§ 404.970(b), 416.1470(b) (2007). Additionally, the regulations explain that,

> The Appeals Council will consider all the evidence in the [ALJ] hearing record as well as any new and material evidence submitted to it which

relates to the period on or before the date of the [ALJ] hearing decision. If [the claimant] submit[s] evidence which does not relate to the period on or before the date of the [ALJ] hearing decision, the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [the] right to file a new application.

20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) (2007).

Here, because these particular records submitted by Bowers were not related to the time period on or before the ALJ's decision, the Appeals Council properly declined to incorporate the evidence into the record. Bowers argues that the Appeals Council erroneously disregarded these additional records. However, because the records were not relevant to the time period on or before the ALJ's decision and were refused by the Appeals Council, Bowers's remaining remedy was her right to file a new application for benefits. *See* 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1) (2007); *see generally* 20 C.F.R. §§ 404.620(a)(2), 416.330(b) (2007). The ALJ recognized that the records were not material to the relevant time period and also recognized that Bowers had already filed a new application; thus, by refusing to incorporate the additional records and forwarding them to the local Social Security office so as to provide evidence relevant to the new application, (R. at 5), the Appeals Council acted in accordance with the regulations.

Next, Bowers contends that the Appeals Council failed to thoroughly explain why the additional evidence incorporated into the record did not provide a basis for disturbing the ALJ's decision. (Plaintiff's Brief at 10-11.) In a case such as this, where the Appeals Council incorporated the relevant additional evidence into the record, but, after considering the evidence, found no reason to justify a review of the ALJ's decision, the

-26-

Appeals Council is not required to state with specificity why the additional evidence failed to warrant a review. *See Hollar v. Commissioner of Social Security Admin.*, 1999 WL 753999, *1 (4th Cir. Sept. 23, 1999) (unpublished opinion) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). The Appeals Council plainly stated that the additional evidence was considered, but "[did] not provide a basis for changing the [ALJ]'s decision." (R. at 4-5.) While it is not the Appeal Council's duty to precisely set forth its reasoning in detail, because the additional evidence was considered by the Appeals Council, and it was determined that the evidence did not warrant review, this court must now review all of the evidence considered by the ALJ, as well as the additional evidence considered by the Appeals Council, to determine if the ALJ's findings were supported by substantial evidence in the record.

As such, the court will now address Bowers's final argument, and, in doing so, the undersigned will determine whether the ALJ's decision, in light of the additional evidence, was supported by substantial evidence within the record. Bowers argues that the ALJ's decision as to her mental capabilities was not supported by substantial evidence and contends that the record shows that her mental impairments are more severe and limiting than found by the ALJ. (R. at 5-9.) The ALJ determined that Bowers's history of a possible seizure disorder and anxiety were severe impairments; however, he determined that the impairments did not meet or medically equal one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ concluded that Bowers had the residual functional capacity to perform simple, low-stress light work that did not require working in an environment which would expose her to hazards. (R. 18.) In essence, Bowers argues that the ALJ's residual functional capacity finding is flawed because the state agency physicians did not have the benefit of

-27-

reviewing records dated February 2005 and January 18, 2006, from Johnston Memorial Hospital ER; records dated September 12, 2005, through June 28, 2006, from Stone Mountain Health Services; and records dated June 26, 2006, from Highlands Community Services, as the records were dated subsequent to the state agency physician's findings. (Plaintiff's Brief at 6-9.)  Bowers argues that different findings may have been made if the state agency physicians had the opportunity to review the aforementioned medical records, which, in turn, may have impacted the ALJ's residual functional capacity determination.  (R. at 8.)

The undersigned points out that the ALJ did not fully adopt the state agency findings as to Bowers's mental limitations; instead, he gave Bowers the benefit of the doubt and determined that her anxiety disorder was severe, which directly conflicted with the state agency determination that Bowers did not suffer from a severe impairment. (R. at 18, 181.)  The state agency physicians also reported only mild restrictions in Bowers's activities of daily living, in the ability to maintain social functioning and in the ability to maintain concentration, persistence and pace.  (R. at 191.)  Similarly, the ALJ found that Bowers's anxiety resulted in "no greater than mild restrictions in her ability to maintain concentration, persistence, or pace."  (R. at 17.)  After examining the evidence the state agency physicians did not have the opportunity to review, the undersigned is of the opinion that the evidence would not have altered the state agency findings.  Although the evidence is representative of further treatment regarding complaints of anxiety, it fails to include any significant medical findings different from those presented in the evidence the state agency physicians *did* review.  In particular, the evidence not available to the state agency physicians simply reiterated findings already present in the evidence, i.e. diagnoses of general anxiety and prescriptions for Xanax.

-28-

(R. at 195, 246.)  Notably, the personnel at Stone Mountain Health Services opined that there was no reason for Bowers to be prescribed Xanax.  (R. at 241.)  In my opinion, the simple fact that Bowers received further treatment related to anxiety, and the fact that she sought counseling at Highlands Community Services, does not indicate that the state agency physicians' findings would have been different had the records been available at the time of their evaluation because there were no new, significant medical findings or diagnoses that would have likely have led to a different conclusion by the state agency physicians.  Moreover, much of the evidence from these records merely includes Bowers's subjective allegations.  (R. at 235-40.)  For the reasons stated above, I am of the opinion that Bowers's argument as to this issue must fail.

However, after considering the additional evidence presented to the Appeals Council following the ALJ hearing, it is readily apparent that this particular evidence could have possibly led the ALJ to a different conclusion, or, at a minimum, caused him to impose further restrictions upon Bowers, thereby impacting the residual functional capacity determination.  The court recognizes that a large portion of the additional evidence is irrelevant.  Specifically, the medical records from Washington County Health Department - VDH Family Planning dated October 12, 1987, to October 26, 2005, pertain to reproductive health and mention only limited complaints of anxiety.  (R. at 280-325.)  In addition, the medical records dated May 5, 2005, to February 9, 2006, from the University of Virginia, Department of Neurology simply reiterate medical findings previously mentioned within the original record.  (R. at 326-37.)

By contrast, however, the medical records dated August 2, 2006, to November 6, 2006, contain medical findings and treatment notes that may have caused the ALJ to

-29-

place further restrictions on Bowers's residual functional capacity. (R. at 264-79.) These records show that Bowers sought and received additional counseling and treatment in relation to her alleged mental impairments. (R. at 264-79.) The records also reveal further diagnoses of anxiety disorder and marijuana dependence, as well as evidence that Bowers was prescribed Remeron and Vistaril, which are both commonly prescribed to treat anxiety. (R. at 265, 276.) Additionally, and of greater concern, is the fact that these records show that during the time period of August 2, 2006, to November 6, 2006, Bowers's GAF score was assessed as ranging between 48 and 55. (R. at 265, 269, 275-77, 279.) A GAF assessment considers several aspects of an individual's mental health. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). In particular, as noted earlier, a GAF score of 51-60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32. Furthermore, a GAF score of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, *unable to keep a job*)." DSM-IV at 32 (emphasis added). The medical records indicate that Bowers was assessed a GAF score of 50 on November 6, 2006, which is the last date of treatment from Highlands Community Services found in the record. (R. at 279.)

Because a GAF score of 50 indicates serious symptoms, and is representative of the inability to maintain a job, the undersigned is of the opinion that these particular medical records are very probative as to Bowers's mental capabilities. Thus, it is entirely possible that, had the ALJ reviewed the additional records from Highlands Community Services, further restrictions or limitations could have been placed upon Bowers's residual functional capacity, thereby impacting the the determination of

-30-

whether there were jobs within the national economy that Bowers could perform. The undersigned does not intend to imply that the consideration of these records would have led to a determination of disability; however, the undersigned notes that the consideration of the records could easily have altered the ALJ's findings. Therefore, because it appears that the ALJ's decision would have been impacted had the records from Highlands Community Services been included in the original record before the ALJ, the undersigned is of the opinion that the ALJ's residual functional capacity finding is not supported by substantial evidence.

Based on my review of the record and the above-stated reasons, I find that substantial evidence does not exist in the record to support the ALJ's findings. I recommend that the court deny Bowers's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Pursuant to 42 U.S.C. § 405(g) sentence six, a remand is not warranted, as the additional evidence was properly incorporated into the record by the Appeals Council;

2.  The Appeals Council properly refused to incorporate certain additional evidence dated December 20, 2006, and November 27, 2006, to January 2, 2007, as that evidence did not relate to the time

-31-

period on or before the date of the ALJ's decision; and

3. Substantial evidence does not exist in the record to support the ALJ's decision regarding Bowers's mental residual functional capacity.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bowers's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further consideration consistent with this report and recommendation.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period,

the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, Chief United States District Judge.

The clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 24th day of June 2008.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE